**RAS DEVELOPMENT CORPORATION,
Appellant,**

**v.**

**FAYETTE COUNTY BOARD OF
ASSESSMENT APPEALS.**

Commonwealth Court of Pennsylvania.

Argued June 2, 1997.

Decided Dec. 8, 1997.

Robert J. Burnett, Pittsburgh, for appellant.

Robert L. Webster, Jr., Uniontown, for appellee.

Before DOYLE and LEADBETTER, JJ., and JIULIANTE, Senior Judge.

DOYLE, Judge.

RAS Development Corporation (RAS) appeals from an order of the Court of Common Pleas of Fayette County which established the tax assessment valuation for the years 1992 through 1997 on four parcels of land owned by RAS.

RAS is the owner of four tracts of real estate located in Saltlick Township, Fayette County, which it initially purchased as an investment at a sheriff's sale on March 28, 1991, for $1,500,000.00. Three of the four tracts of land consist of undeveloped property totaling 271.895 acres in size. The fourth tract of land has been developed into a camp-ground facility, known as Mountain Pine Resort, and consists of 87.022 acres. The Mountain Pine Resort facility consists of approximately 950 rental spaces or pads which are leased on a daily, monthly or yearly basis. However, since the property was purchased in 1991, it has yet to produce a profit for RAS and has, in fact, consistently produced a loss.

Accordingly, RAS, wishing to reduce its tax burden, filed with the Board a timely appeal from its 1992 tax assessment in 1991, and a hearing was held before the Board on October 28, 1991. By order dated October 31, 1991, the Board revised the 1992 tax assessment and combined the assessments of the four tracts of land into one assessment as follows:

1. Parcel No. 31–12–84 consist of 75.725 undeveloped acres. The 1992 assessment was revised from 13,130 to 0. The assessment was combined with Parcel No. 31–12–78.

2. Parcel No. 31–12–89 consist of 50.25 undeveloped acres. The 1992 assessment was revised from 16,500 to 0. The assessment was combined with Parcel No. 31–12–78.

3. Parcel No. 31–12–50–7 consist of 145.95 undeveloped acres. The 1992 assessment was revised from 33,560 to 0. The assessment was combined with Parcel No. 31–12–78.

4. Parcel No. 31–12–78 consists of 87.022 developed acres. The 1992 assessment was revised from 400,390 to 374,260. The assessments of the three undeveloped parcels of land stated hereinabove were combined with this developed parcel of land.

(Trial Court Opinion at 2.)

Thereafter, on November 26, 1991, RAS appealed the Board's October 30th order to the Court of Common Pleas. Subsequently, a hearing was held before the Honorable Richard Cicchetti on March 25, 1995.

At the March 25th hearing, James A. Hercik, Chief Assessor and Director of Assessments for Fayette County, testified for the Board. Specifically, Hercik testified that he performed an on-site review of the subject

property with the prior owners in May of 1987, at the time it was being developed into a commercial campground, and that he visited the property again on two subsequent occasions. Hercik also testified that on March 28, 1991, RAS paid Harva Inc., a holding company created by Gallatin National Bank, the amount of $1,500,000.00 for the subject property. He explained that the property was the subject of a sheriff's sale during a mortgage foreclosure action.

Hercik further stated that he used the market data approach method or comparable sales approach to determine the valuation of both the undeveloped and developed portions of the property. Specifically, he used the following three comparable sales to determine the fair market value of the undeveloped portion:

1. Actual sale of the subject property: 272 acres for $525,000.00 on December 16, 1986 from Wilma Ida Miller, grantor, and others to Alpine Valley Resorts, Inc. The unit rate of $1,930.00 per acre was adjusted to $1,750.00 per acre. The adjusted rate was determined by subtracting the value of the improvements, the residence, and the farm buildings from the gross sale to obtain a value for vacant unimproved real estate.

2. The sale of Nemacolin, Inc. to the Hutterian Brethren on July 23, 1987 for $677,090.00. The property consisted of 658 acres of wooded land located on an unimproved township road. The unit rate per acre was $1,028.00.

3. The sale from Nemacolin, Inc. to Evans Resources, Inc. on October 29, 1987 for $134,510.00. The property consisted of 107 acres of wooded and hilly land on a state improved road in Wharton Township. The unit rate was $1,253.00 per acre.

(Trial Court Opinion at 4.)

Hercik testified that he used these three sales to determine that the range of values for the property was from a minimum of $1,028.00 per acre to a maximum of $1,750.00 per acre. He then assigned a unit rate of $1,500 per acre to the undeveloped portion of

the subject property. Using this unit rate, the proposed value for the undeveloped 271.895–acre tract was computed at $407,842.00.

Hercik then testified that he used the market data approach in order to assess the value of the developed portion of the subject property. He stated that he considered five comparable sales to evaluate the raw land portion of the developed tract and that he utilized the cost approach to value all of the improvements on the property. Hercik further testified that the comparable sales of land being developed for commercial use ranged from a minimum of $2,800.00 per acre to a maximum of $6,000.00 per acre.[1] After adjusting for topography, location, available utilities, and roadways, Hercik concluded that $5,500.00 per acre was the appropriate and fair market value for the 87–acre developed portion of the subject property. Using this unit rate, he calculated the market value of the 87 acres of land utilized as a camping facility as $478,621.00.

With respect to the improvements situated on the property, Hercik testified that he used the cost approach method and that, after consulting the cost manual of Marshall & Swift, valued the 22 individual structures or improvements on the subject property at $1,809,187.00. Ultimately, Hercik opined that, based upon the comparable sales and cost approach methods, he determined the total fair market value of the subject property to be $2,696,000.00 He recommended this amount to the Board, which adjusted the figure to $2,692,500.00.

Neither party presented any other expert witnesses, and no other witness testified as to the fair market value of the subject real estate.

After the resignation of President Judge Cicchetti, the case was reassigned to the Honorable John F. Wagner, Jr. in January of 1996 for disposition based upon the existing trial transcript and official record. Judge Wagner issued an opinion and order on November 5, 1996. In that opinion, Judge Wag-

---

1. Hercik also explained that he used the sales from the adjoining counties of Westmoreland and Somerset, because he believed that those

properties were located within sufficient proximity to the subject property.

ner used Hercik's comparable sales figures to derive an average unit rate per acre for both the undeveloped and developed portions of the subject property. He used a unit rate of $1,404.00 per acre for the 271.895 acres of undeveloped property, and computed the assessed value of that property to be $381,741.00. He then used a unit rate of $4,072.00 per acre for the 87.022 acres of developed property and determined that the assessed value of that property was $354,354.00.[2] Because no evidence was presented to the contrary, Judge Wagner also accepted Hercik's figure of $1,809,187.00 as the value of improvements and structures situated on the developed portion of the property.

In his November 5, 1996 opinion and order, Judge Wagner ultimately concluded that the fair market value of the subject property was $2,545,282.00, and, accordingly, he set out the following assessment figures:

| TAX YEAR | MARKET VALUE | RATIO | ASSESSED VALUE |
| --- | --- | --- | --- |
| 1992 | $2,545,282.00 | 13.6% | $353,794 |
| 1993 | $2,545,282.00 | 13.8% | $351.249 |
| 1994 | $2,545,282.00 | 13.4% | $341,068 |
| 1995 | $2,545,282.00 | 13.6% | $346,158 |
| 1996 | $2,545,282.00 | 13.7% | $348,704 |
| 1997 | $2,545,282.00 | 12.5% | $318,160 |

(Trial Court Opinion at 18.) This appeal ensued.

■ Our standard of review on appeal from the decision of a trial court in a tax assessment appeal is limited to determining whether the trial court abused its discretion, committed an error of law, or whether its decision is supported by substantial evidence. *Westinghouse v. Board of Assessment*, 539 Pa. 453, 652 A.2d 1306 (1995).

RAS raises three issues for our consideration on appeal: (1) whether the court of common pleas improperly incorporated the 1996 and 1997 tax years into the pending appeal without providing for additional evidence; (2) whether the lower court improperly utilized a valuation method which ignored the loss produced by the subject property; and (3) whether the lower court considered incompetent and irrelevant evidence in determining the value of the subject property.

■ First, RAS contends that the trial court erred when it incorporated the 1997 tax year into its November 5, 1996 opinion and order. Section 704 of the Fourth to Eighth Class County Assessment Law (Assessment Law), Act of May 21, 1943, P.L. 571, *as*

amended, 72 P.S. § 5453.704, provides in pertinent part as follows:

(f) If a taxpayer has filed an appeal from an assessment, so long as the appeal is pending before the board or before a court on appeal from the determination of the board, as provided by statute, the appeal will also be taken as an appeal by the taxpayer on the subject property for any valuation for any assessment subsequent to the filing of such appeal with the board and prior to the determination of the appeal by the board or the court. . . .

72 P.S. § 5453.704(f). Additionally, in *Chartiers Valley School District v. Board of Property Assessment Appeals & Review*, 154 Pa. Cmwlth. 81, 622 A.2d 420 (1993), this Court stated: "Once the [tax assessment appeal] has come before the court of common pleas, that court must hear evidence and decide all properly presented issues relevant to all the tax assessments incorporated into the appeal." *Id.* 622 A.2d at 429. Thus, as long as an assessment appeal remains pending before the Court of Common Pleas, any assessments for subsequent tax years arising during this pendency period are automatically appealed.

---

**2.** In his November 5, 1996 opinion, Judge Wagner considered the unit rate per acre of only three of the five proposed "comparable sales" in deriving the average unit rate of $4,072.00 per acre for the developed portion of the property.

Apparently, he concluded that two of the five proposed "comparable sales" were too dissimilar to the subject property to be accorded any significant probative weight.

In this case, RAS's assessment on the subject property for tax years 1992 through 1997 was established as of September 1, 1996, when neither RAS nor any taxing district filed an appeal with the Board pursuant to Section 701(b) of the Assessment Law, 72 P.S. § 5453.701(b).[3] Thus, contrary to RAS's assertion, its assessment for the 1997 tax year was pending when the case was decided by the trial court on November 5, 1996, and RAS's 1997 tax assessment was therefore properly considered by the trial court.[4]

Next, RAS contends that, in calculating the actual market value of the property, the trial court erred by failing to consider the loss generated by the property since its purchase in 1991. In general terms, actual market value is "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *In re Appeal of Johnstown Associates*, 494 Pa. 433, 438, 431 A.2d 932, 935 (1981). Additionally, Section 602 of the Assessment Law provides as follows:

> (a) It shall be the duty of the chief assessor to rate and value all subjects and objects of local taxation ... according to the actual value thereof, and in the case of subjects and objects of local taxation other than real property at such rates and prices for which the same would separately bona fide sell.... **In arriving at the actual value, all three methods: namely, cost (reproduction or replacement, as applicable, less depreciation and all forms of obsolescence), comparable sales and in-come approaches, must be considered in conjunction with one another....**

72 P.S. § 5453.602(a) (emphasis added).

Thus, RAS is correct to the extent that it contends that the income approach method bears some relevance in the determination of "actual" or fair market value. In this case, it may well be that, in using the income approach method of ascertaining fair market value, an expert would have proposed a figure that reflected the loss generated by the property, and, in this regard, we note that RAS presented testimony and documentary evidence supporting its contention that the property has in fact produced a loss throughout the years. However, RAS presented absolutely no testimony or other evidence relating to the impact that such a loss would have on the actual fair market value of the property, and no expert or other witness testified as to what the actual value of the property would be had the income approach method been utilized. As noted above, the only evidence whatsoever presented on the issue of fair market value was the testimony of the Board's expert witness, Mr. Hercik, who utilized the cost and comparable sales approach methods.

Additionally, in *CNG Coal Co. v. Greene County Board of Assessment & Revision of Taxes*, 121 Pa.Cmwlth. 443, 551 A.2d 328 (1988), *overruled on other grounds by In re Appeal of Churchill*, 525 Pa. 80, 575 A.2d 550 (1990), this Court held that, notwithstanding the fact that Section 602(a) of the Assessment Law states that *all three* valuation methods should be considered, a trial court, in its sound discretion, may reject all three methods of valuation if the methods are

---

**3.** Section 701(b) of the Assessment Law provides in pertinent part as follows:

> (b) Any person aggrieved by any assessment whether or not the value thereof shall have been changed since the preceding annual assessment ... may appeal to the board for relief. Any person ... desiring to make an appeal shall, on or before the first day of September, file with the board an appeal....

72 P.S. § 5453.701(b). We also note that Section 701(c)(6) of the Assessment Law provides that "[a]ll appeals shall be heard and acted upon by the board by not later than the last day of October." 72 P.S. § 5453.701(c)(6).

**4.** RAS also argues that the trial court committed an error of law because RAS never had the opportunity to present any evidence pertaining to the 1996 or 1997 tax years. Specifically, the hearing before the trial court occurred on March 20, 1995, while the trial court's final opinion and order was issued on November 5, 1996, and RAS contends that "[e]vidence of intervening income or loss and of comparable sales since March 20, 1995, would have been highly relevant and essential to a determination of the proper assessment for each year." (Brief of RAS at 12.) But nothing prevented RAS from (a) separately appealing those tax years, and/or (b) requesting the trial court to hear additional evidence.

found to be inapplicable. It logically follows from this, therefore, that a trial court also has the discretion to reject any *one* of the three methods if it concludes it is inapplicable or of little probative force because no evidence was presented with regard to that particular method.

Moreover, as this Court held in *Timber Trails Community Association v. County of Monroe,* 150 Pa.Cmwlth. 29, 614 A.2d 342 (1992):

In tax assessment appeals, the initial burden is upon the Board to establish a prima facie case with regard to valuations. The burden thereafter shifts to the taxpayer to present sufficient competent, credible and relevant evidence to overcome the prima facie validity of the Board's action.

*Id.* 614 A.2d at 345; *see also Monroe County Board of Assessment Appeals v. Miller,* 131 Pa.Cmwlth. 538, 570 A.2d 1386 (1990). Thus, in this case, once the County presented its case, the burden shifted to RAS to present evidence which would undermine the County's valuation of the property. Because RAS did not present any valuation evidence, or contrary testimony, which would undermine Hercik's testimony regarding the market value of the subject property, we must reject its argument that the trial court erred in its assessment determinations.

Additionally, we note in passing that Hercik testified why he did not use the income approach method of valuation in determining the fair market value of the subject property:

Q: Now, with respect to the three approaches or methods that you customarily follow, did you employ each of those methods in your appraisal of this particular [property]?

A: I attempted to, yes.

Q: Were you able to use the income approach in this particular case?

A: No, I was not.

Q: And could you state for the Court why you were unable to use that particular method?

A: At the time of the appeal, the appellant had only owned the property for approximately five months; I believe they had purchased it in March of that year and the appeal was being held in September; therefore, the income and expense data that was presented to the [B]oard at that point in time was only a partial year for the initial time period. Attempts after that date to secure income and expense data from the appellant were unattainable.

Q: And what attempts did you make to secure income information from the appellate subsequent to the hearing in October of '91?

A: We had contacted [RAS'] attorney on several occasions and we had also sent correspondence to the appellant via the first class mail service and also by certified mail, requesting the income and expense data for the years in question.

Q: But you weren't successful in obtaining that information despite those efforts?

A: The income and expense data was delivered to our office approximately a day and a half before today's hearing and [I] was not given adequate time to prepare a formal income appraisal based on the limited time factor.

(Notes of Testimony (N.T.), 3/20/95, at 13–14; Reproduced Record (R.R.) at 47a–48a.)

■ RAS further argues that the trial court should have accorded greater weight to the fact that RAS paid only $1,500,000.00 for the property in March of 1991. Yet as RAS concedes in its brief, Section 602 of the Assessment Law specifically provides that a prior sale of the subject property is not dispositive of the actual market value for assessment purposes:

(a) ... In arriving at such value, the price at which any property may actually have been sold either in the base year or in the current taxable year shall be considered, **but shall not be controlling.** Instead, such selling price estimated or actual shall be subject to revision by increase or decrease to accomplish equalization with other similar property within the county.

72 P.S. § 5453.602(a) (emphasis added). The record indicates that the County's Chief Assessor, Mr. Hercik, did consider the weight

to be given to the $1,500,000.00 sale price of the property during his valuation. However, in addition to the fact that the property was purchased at a sheriff's sale as part of a mortgage foreclosure action, Hercik testified on cross-examination as to additional reasons for attributing little weight to the sale price of the property:

Q: You indicated that you felt that the acquisition value here was not controlling, but I'm not sure you answered exactly why you felt that it was not controlling?

A: Due to factors that led up to the sale, the campground had received somewhat of a negative image in the marketplace due to the fact that the time shares were sold out and then ... as part of the Sheriff's sale, many of the ... time-share owners who had purchased the interest in these lots for anywhere from $3,000.00 to $8,000.00 had all lost their initial investment. There was much publicity on the local televisions, newspapers, concerning this, that these homeowners had invested their money and had basically lost it due to the prior management of this facility. So at that time the campground in my opinion had somewhat of a negative image. Also, the fact that this was a Sheriff's sale, many times the banks are looking only to get out from underneath the property for what they can to recover as much of their costs as they can, but the banks are not in the business to hold real estate.

Q: So you're saying that in your opinion the sale in 1991 from Harva to RAS Development was not the fair market value?

A: I would have deemed it as a distress sale.

(N.T., 3/20/95, at 45–46; R.R. at 79a–80a.)

This precise issue was addressed by our Supreme Court in *Appeal of Barry*, 353 Pa. 72, 44 A.2d 296 (1945), in which the Court adopted the following reasoning of the trial court:

The appellant would have us adopt the sale price as the proper valuation for tax purposes of the property in question. To do this would make the sale price controlling, which is contrary to the act of assembly and the decision which holds the sale price must be considered but shall not be controlling.

. . . .

In *Suerman [Suermann] v. Hadley*, 327 Pa. 190, [205,] 193 A. 645, [653 (1937),] the Supreme Court held: 'Sale price, while an important element of market value, has never been held controlling.... [In] *Hickey's Appeal*, 326 Pa. 467, 192 A. 923 [(1937)], [the Supreme Court] held that the price for which the property sold at a bona fide sale was not controlling where evidence was adduced to show a higher value. The sale price was entitled to great weight as an important item of evidence, but market value was the actual value for assessment uninfluenced by vague theories of actual value. Likewise, a bona fide offer of sale is not solely determinative of market value, but is merely evidentiary: *Appeal of American Academy of Music*, 321 Pa. 433, 184 A. 657 [(1936)].'

. . . .

It is argued that Mr. McCaffrey, testifying in behalf of the County and the City, failed to take the sale price into consideration. It is our conclusion, after reading the testimony, that adequate consideration was given to the sale price by Mr. McCaffrey in reaching his valuation.

*Id.* at 74–75, 44 A.2d at 297 (citations omitted). Similarly, in this case, the record indicates that Hercik considered the sale price and found that it should not control the valuation, and the trial court therefore did not err in refusing the adopt the sale price as the actual market value for assessment purposes.

Finally, RAS argues that the trial court erred by improperly considering "incompetent and irrelevant evidence" in determining the value of the subject property. Specifically, RAS contends that, although the trial court concluded two of the five proposed comparable sales were too dissimilar, it erred by relying on the three other comparable

sales because those sales were too dissimilar as well.

First, it is well-settled that all matters of credibility and evidentiary weight are within the exclusive province of the trial court and that these determinations are binding on this Court absent an error of law. *Walnut–Twelve Associates v. Board of Revision of Taxes of Philadelphia,* 131 Pa. Cmwlth. 404, 570 A.2d 619 (1990), *petition for allowance of appeal denied,* 525 Pa. 652, 581 A.2d 577 (1990). The record in this case does not support RAS's contention that such an error occurred in this case.

Second, RAS never objected to the admission of this allegedly irrelevant evidence during the hearing, and because a party who does not object to the admission of evidence when it is presented is deemed to have waived any objections thereto, *e.g., Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986), RAS cannot now complain that such unobjected to evidence was improperly admitted.

Accordingly, for the foregoing reasons, we affirm the decision of the trial court.

### ORDER

**AND NOW,** December 8, 1997, the order of the Court of Common Pleas of Fayette County in the above-captioned matter is hereby affirmed.