# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Missouri River Corp. | : | |
| | : | |
| v. | : | |
| | : | |
| Erie County Board of Assessment | : | |
| Appeals, Erie County, PA | : | |
| | : | |
| Interested Parties: | : | |
| City of Erie School District, City of | : | |
| Erie and Erie County | : | |
| | : | |
| Parcel No.: 17-040-037.0-210.00 | : | |
| Property Address: 1012 W. Bayfront | : | |
| Pkwy., City of Erie, Erie County | : | |
| | : | |
| Appeal of: Missouri River Corp. | : | |
| (Sunrise Senior Living, Inc., tenant and | : | |
| agent) and NHI-REIT of Bickford, | : | |
| (Bickford Master Buckeye, LLC, | : | |
| tenant and agent), successor-in-interest | : | |
| to Missouri River Corporation | : | No. 639 C.D. 2019 |
| | | |
| Missouri River Corp. | : | |
| | : | |
| v. | : | |
| | : | |
| Erie County Board of Assessment | : | |
| Appeals, Erie County, PA | : | |
| | : | |
| City of Erie School District, City of | : | |
| Erie and Erie County | : | |
| | : | |
| Parcel No.: 17-040-037.0-210.00 | : | |
| | : | |
| Appeal of: Missouri River Corporation | : | No. 640 C.D. 2019 |
| and NHI-REIT of Bickford | : | Argued: February 11, 2020 |


BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                          FILED:  March 2, 2020

Missouri River Corp. (Sunrise Senior Living, Inc., tenant and agent) (Missouri River) and NHI-REIT of Bickford (Bickford Master Buckeye, LLC, tenant and agent) (Bickford Master), successor-in-interest to Missouri River Corporation (Current Owner) (collectively, Taxpayers) appeal from the Erie County (County) Common Pleas Court's (trial court) April 29, 2019 order denying Taxpayers' appeal and entering judgment in the City of Erie School District's (District) favor.  There are two issues before this Court: (1) whether Taxpayers waived all issues on appeal by filing an insufficiently detailed statement of errors complained of on appeal; and (2) whether the trial court committed an error of law by including intangible assets and other personal property in the fair market value of the Taxpayers' property.  After review, we affirm.

The instant matter arises from a tax assessment appeal for property located at 1012 West Bayfront Parkway, Erie, Pennsylvania (Property).  The Property is the situs of a 69-room personal care facility (Facility) that Karrington Operating Company, Inc. (Original Lessee) constructed between 1996 and 1998.  In 1998, Original Lessee negotiated a sale leaseback to Missouri River (1998 Sale Leaseback), a real estate investment trust (REIT),[1] and entered into a long-term lease (Original Lease) as lessee with Missouri River as lessor that ran through 2018.

The Original Lease defined "Leased Property" to include "personal tangible and intangible property . . . acquired by [Missouri River] pursuant to the Purchase Agreement [(Purchase Agreement)]."[2]  Reproduced Record (R.R.) at 567a.

---

[1] *See* Reproduced Record (R.R.) at 252a.

[2] The Original Lease defined the "Purchase Agreement" as "[t]hat certain Agreement of Purchase and Sale and Joint Escrow Instructions, dated as of May 12, 1998 . . . providing for [Missouri River's] acquisition of the Leased Property . . . ."  R.R. at 573a.

2

In addition, the Original Lease described "Facility" as "[t]hat certain assisted living facility which is part of the Leased Property . . . inclusive of the Land, Leased Improvements, Fixtures, Personal Property and Intangible Property pertaining to such Facility." R.R. at 570a. Section 6.3 of the Original Lease provided: "**Lessee may** . . . at its expense, **install, assemble or place** on any parcels of the Land or in any of the Leased Improvements, **any items of Lessee's Personal Property,**[3] **and Lessee may**, subject to the conditions set forth below, **remove the same upon the expiration or any prior termination of the Term**." R.R. at 579a (emphasis added). Additionally, Section 9.1.4 of the Original Lease declared:

> Unless Lessor shall convey any of the Leased Property to Lessee pursuant to the provisions of this Lease, and **subject to the provisions of Paragraph 6.3** regarding Lessee's Personal Property, upon the expiration or prior termination of the [t]erm, **all the Leased [P]roperty, including all [f]ixtures and Personal Property located thereon**, and any [**a**]**lterations, repairs, restorations, additions or improvements otherwise made by or for Lessee, shall be Lessor's property and shall be vacated and surrendered to Lessor** . . . .

R.R. at 584a (bold and underline emphasis added). Further, the Original Lease stated that Missouri River would, at the term's end or at the earlier termination of the Original Lease, own patient and other records. *See* R.R. at 584a-585a. The Original

---

[3] The Original Lease defines Lessee's Personal Property as:

> All machinery, equipment, furniture, furnishings, moveable walls or partitions, computers, or trade fixtures or other personal property, and consumable inventory and supplies, owned by Lessee and used or useful in Lessee's business on the Leased Property and located thereon, including without limitation, all items of furniture, furnishings, equipment, supplies and inventory, except items (i) included within the definition of Fixtures; and (ii) personal property described in Paragraph 1.1(v) above [(pertaining to personal property acquired by Lessor pursuant to the Purchase Agreement)].

R.R. at 572a.

3

Lease required that, at Missouri River's request upon the Original Lease's termination or expiration, Original Lessee was to use its best efforts to transfer to Missouri River or its nominee, all licenses, operating permits, governmental authorizations and all contracts necessary for the Facility's operation. *See* R.R. at 611a.

Original Lessee operated the Facility and made yearly lease payments to Missouri River. As of January 31, 2008, the Property's real estate was assessed for $7,400,000. On July 31, 2008, Missouri River filed an appeal with the Erie County Board of Property Assessment Appeals (Board) challenging the $7,400,000 assessment. The Board sustained the January 31, 2008 assessment and Taxpayers appealed to the trial court. The District intervened. In 2013, while the appeal was pending, the County conducted a county-wide reassessment which increased the Property's assessment to $8,062,400. Taxpayers filed a protective appeal and the two matters were consolidated for trial.

On April 30, 2018, the Original Lease between Missouri River and Original Lessee expired. That same day, Missouri River sold the Facility to Current Owner as part of a portfolio of five assisted living properties.[4] The Facility's allocated sale price was $15,768,000. Current Owner leased the Property through

---

[4] Four of the properties in the portfolio were located in Ohio. According to the Real Property Conveyance Fee Statements of Value and Receipt, one Ohio property was valued at $18,090,000. "Of that, [$]280,000 was paid for items other than real . . . property." R.R. at 79a; *see also* R.R. at 862a. Another Ohio property was valued at $14,242,500. Of that amount, "the portion for items other than real property was [$]190,000." R.R. at 80a; *see also* R.R. at 863a. A third Ohio property was purchased for $12,075,750, which included $200,000 for items other than real property. *See* R.R. at 80a, 864a. The fourth Ohio property was purchased for $7,323,750 which included $170,000 for items other than real property. *See* R.R. at 80a, 865a. Notably, no similar allocation representing the portion of the purchase price for items other than real property was made for the Property. *See* R.R. at 867a.

4

2033 (2018 Lease) to Bickford Master, which subleased the Property to Bickford of Erie, LLC (Current Lessee), Bickford Master's wholly owned subsidiary.[5]

The 2018 Lease described the leased Property to include "all of the [Current Owner's] right, title and interest in and to all the Land, the Facilities, the [furniture, fixtures and equipment (]FF&E[)], [and] all other personal property" owned or thereafter acquired by Current Owner and located at the Facility. R.R. at 711a. Further, the 2018 Lease defined "Facilities" as "the facilities and all land, improvements (whether now existing or made during the term of the Lease), FF&E, other personal property and intangibles, owned by [Current Owner] as set forth on Schedule 1 and located at and used in the operation of [the] Facility." R.R. at 704a. The 2018 Lease also described "Personal Property" to include inventory and records. It defined "Inventory" as "the operating supply of consumable supplies, including food, drugs, medicines, materials and other supplies used in connection with the operation of [the] Facility." R.R. at 707a. Records are described in the 2018 Lease as "electronic, digital or written files and records . . . ." R.R. at 709a.

On December 19 and 20, 2018, the trial court held a hearing on Taxpayers' appeal. At the hearing, the Board offered County Assessment Director Scott Maas' (Maas) testimony. Maas explained that, according to the County Assessment Office, the Property's assessed value between 2009 and 2012 was $7,400,000. After the county-wide reassessment in 2013, the Property's assessed

---

[5] According to Current Lessee's co-president, Michael Eby (Eby), the transfer to Current Lessee included more than the real estate, such as "the rents -- the rents and the healthcare component that the residents pay, and then also the staff costs, food costs that we use. So the net operating income of the business." R.R. at 72a. Eby elaborated: "[t]he contracts with the residents to provide the services that the seller -- that . . . the previous operator, was currently providing. There are the furniture and the fixtures [that] were transferred over. The employees, we assumed those. We took all of them -- hired all of them, so." R.R. at 75a-76a. Eby also described that patient records and some food inventory was transferred.

value was $8,062,400. Current Lessee's co-president Michael Eby (Eby) appeared for Taxpayers.

Both Taxpayers and the District presented the testimony of certified real estate appraisers, who calculated the Property's fair market value using the cost, comparable sales and income approaches. Taxpayers' valuation expert Mark R. Shonberg (Shonberg) valued the Property between $6,190,000 and $6,900,000 for tax years 2009 through 2019. Although Shonberg considered all three valuation approaches and developed the cost approach and income approach, he reached his ultimate valuation opinion based on the cost approach. Shonberg related that, in preparing his income approach, he did not use the Property's yearly lease payments because the leases included intangible assets, personal property and business value. Shonberg explained that "[t]he primary challenge [in appraising a personal care home] is making sure you allocate correctly between real estate and non-real estate components" because "the real estate and non-real estate aspects are really intertwined." R.R. at 97a. Shonberg expounded:

> So personal care homes, they are – they're residences, but they are residences that provide more than shelter. They provide meals. They provide varying levels of care.
>
> So, for instance, . . . [there's] a trained staff[] in place. There's care and social components to it. There's the meals, wellness visits. There's housekeeping, personal laundry, medication coordination. There's a number of things that are in addition to just the shelter.

R.R. at 97a-98a.[6]

_____

[6] Further, Shonberg opined that a sale leaseback is not an accurate indicator of value. Specifically, he testified:

> [S]ale leasebacks aren't wonderful to use because they don't have to be related to the market. They're simply a mutually beneficial mechanism.

Shonberg justified his disregard of the leases based, in part, on the inclusion of FF&E in the Original Lease. However, Shonberg admitted that he did not know what specific personal property was included therein. He also acknowledged that none of the FF&E present at the Facility in 1998 remained in 2018, because Original Lessee gradually replaced it through the years, and the FF&E value that Original Lessee left at the Property when it ceased operating in 2018 was "relatively small." R.R. at 199a. Ultimately, Shonberg conceded that the FF&E

So if, for instance, [Original Lessee], [its] intent, and this probably was [its] intent, was to raise capital to finance [its] expansion, they wanted the rent to be as high as possible so [it] could raise as much capital as possible so [it] could maximize [its] expansion potential.

So what we see here is that there's a lease in place because [it] want[s] to maximize [its] capital that is above market and we can see it's above market because through the 10 years that we know about, never once did [its] actual operational revenue to the business even cover the lease.

[Trial Court]: If the lease is above market, help me, how does that help [Original Lessee]?

[Shonberg]: That helps [Original Lessee] because [it is] getting a big chunk of money up front. So that lease --

[Trial Court]: Doesn't the lease payment go to Missouri River?

[Shonberg]: The lease payment goes to Missouri River, but because of the sale leaseback [Original Lessee] got paid a big chunk of money up front.

. . . .

[Shonberg]: And the more [it] inflate[s] [the] lease payment, the bigger [it] get[s] paid up front.

[Trial Court]: And [its] lease payment is obviously a deduction for tax purposes.

[Shonberg]: Correct. So --

[Trial Court]: So [it] shift[s] revenue that might have been operating income to the purchase of the dwelling or of the property.

R.R. at 177a-179a.

7

value "is too small of a number to have a material impact," R.R. at 200a, and "the physical, tangible personal property is not a big deal here. What is a more significant component is the intangible personal property." R.R. at 201a.

Shonberg described the "intangible component" to be "things like the in-place staff. It might be . . . the residents that are in place. The medical record cards that are associated with those residents. Things of that nature." R.R. at 107a. Shonberg further detailed the intangible property as "relat[ing] to two different factors, certainly the resident base and the medical records, all that stuff[,]" and "[t]he employee base, so the workforce in place. So those are probably the two big components of intangible property." R.R. at 192a. According to Shonberg, the Original Lease required the intangible assets to be transferred to Missouri River. However, to support that contention, Shonberg could point only to paragraph 1.1(v) of the Original Lease, *see* R.R. at 204a, which provided that, under the Original Lease, Original Lessee rented from Missouri River: "All personal tangible and intangible property comprising the 'Personal Property' and/or the 'Intangible Property' acquired by [Missouri River] **pursuant to the Purchase Agreement**." R.R. at 567a (emphasis added). Thus, pursuant to the Original Lease, the only intangible property used at the Facility and owned by Missouri River was such property that it acquired under the original Purchase Agreement. Neither party offered said Purchase Agreement into evidence and it is not a part of the record below.

Further, regarding the purported value of the Facility's staff, the trial court questioned Shonberg:

> [Trial Court]: **Can't you look at the employees themselves in an individual capacity as [not] having much value because they're always underpaid**. So they're never interested in any one employee. And they don't care as long as everyone doesn't walk out the door or who comes

8

or who goes, they don't really care about that, longevity, ten[ure], skill set. **All they need to know is they got bodies there when they buy**.

[Shonberg]: They do care to some degree about skill set, **but normally you're correct**.

[Trial Court]: For a few people, perhaps. **Generally, they're buying an unskilled labor force that provide unskilled services to these residents at somewhere near minimum wage or slightly above**. And there are few key people who know how they operate and want to crack the whip and keep things going.

[Shonberg]: **Yes, sir**.

[Trial Court]: I'm just guessing.

[Shonberg]: **That's mostly correct**. **And it's certainly mostly a** -- I don't want to say an unskilled labor, but **a marginally skilled** --

[Trial Court]: Even when they employ nurses they try to maximize licensed practical nurses as opposed to registered nurses. They're probably generally few and far between.

[Shonberg]: Right.

R.R. at 201a-202a (emphasis added).[7] Ultimately, Shonberg testified that, in his estimation, $8,000,000 of the $15,768,000 sale price represented intangibles.[8] *See* R.R. at 237a.

Because Shonberg believed that the leases included intangible assets and personal property – items that are not subject to real estate tax – he settled on the cost approach as the appropriate method to determine the Property's fair market value.

---

[7] After Shonberg admitted that Current Lessee changed the Facility's name, the trial court explained with respect to business value: "There's no good will, so it's solely the medical records, the patients, the employees and the fact that it's a going concern . . . ." R.R. at 237a.

[8] This significant amount is in stark contrast to the estimated intangible values for the Ohio properties (which ranged from $170,000 to $280,000). In fact, the $8,000,000 allocation for intangibles is almost 30 times the highest such allocation made for items other than real property for the four Ohio properties in the 2018 transfer.

Using the cost approach, Shonberg calculated the Property's fair market value by first estimating the Property's land value. Shonberg considered nine sales of comparable commercial properties (apartments/hotels). Based thereon, he estimated the land value for the relevant years as follows: 2009 - $1,170,000; 2010 - $1,235,000; 2011 - $1,235,000; 2012 - $1,275,000; 2013 - $1,275,000; 2014 - $1,275,000; 2015 - $1,300,000; 2016 - $1,300,000; 2017 - $1,300,000; 2018 - $1,300,000; 2019 - $1,325,000. *See* R.R. at 426a. With respect to the Property's improvements/buildings, Shonberg determined replacement costs for similarly sized buildings and improvements of like utility. Shonberg also calculated the Property's improvements' yearly depreciation. Shonberg provided the following market values for the Property from 2009 through 2019:

| *Tax Year* | *Cost Approach* | *Income Approach* | *Value Conclusion* |
|---|---|---|---|
| 2009 | $6,515,000 | $4,550,000 | $6,515,000 |
| 2010 | $6,190,000 | $4,310,000 | $6,190,000 |
| 2011 | $6,375,000 | $4,710,000 | $6,375,000 |
| 2012 | $6,380,000 | $5,310,000 | $6,380,000 |
| 2013 | $6,520,000 | $5,440,000 | $6,520,000 |
| 2014 | $6,740,000 | $6,280,000 | $6,740,000 |
| 2015 | $6,725,000 | $6,040,000 | $6,725,000 |
| 2016 | $6,750,000 | $6,520,000 | $6,750,000 |
| 2017 | $6,635,000 | $6,620,000 | $6,635,000 |
| 2018 | $6,810,000 | $7,380,000 | $6,810,000 |
| 2019 | $6,900,000 | $7,840,000 | $6,900,000 |

*See* R.R. at 487a.

Expert appraiser Robert Glowacki (Glowacki) testified for the District regarding the Property's fair market value. Glowacki explained the manner in which he performed his analysis:

> I developed a sales approach. I developed a cost approach. I put basically no weight on those at all. The primary reason is you've got a property that is encumbered by a long-term lease.
>
> And I think the decisions . . . going back to 1992 of the Pennsylvania State Supreme Court, which says when you've got a property that's encumbered by a long-term lease that the income approach is probably the only -- I can quote if you want, but basically the only approach to be considered for a property that's encumbered by the long-term lease, so I put basically all my weight on the income approach.

R.R. at 251a. Glowacki emphasized that since 1998, the Property has been owned by REITs. *See* R.R. at 252a. He explained that a REIT cannot operate the Facility itself and owns the Property as an investment. *See* R.R. at 252a-254a.

Like Shonberg, Glowacki's cost approach involved comparable site sales analysis. Based thereon, Glowacki estimated the Property's land value to be $960,000 for all relevant years. Glowacki calculated the replacement costs for similarly sized buildings and improvements to those on the Property and their depreciation. Glowacki's initial figures were similar to Shonberg's; however, Glowacki added to his cost approach value for each year the difference between the depreciated value and his income approach figure for that year.

Glowacki developed his income approach valuing the Property's leases.[9] Using the actual gross rent paid annually, Glowacki calculated the net rent by making

---

[9] With respect to Shonberg's assertion that the Original Lease included FF&E and intangible property, Glowacki testified that the value of any such property was minimal. Glowacki further explained:

a 2% vacancy and credit loss adjustment, and another 3% reduction for administrative and management fees associated with rent collection. Glowacki then applied a market based capitalization rate to the net rent to produce his income approach indication for each year.

Glowacki valued the Property for the relevant years as follows:

| Year | Cost Approach[10] | Income Approach | Final Value |
|------|-------------------|-----------------|-------------|
| 2009 | $9,900,000 ($3,550,000+$6,350,000) | $9,900,000 | $9,900,000 |

> Through this whole discovery process, [I raised the issue that] I need some clarification as to what is the value of this personal property and intangible property composing the personal property. And the response from counsel on the other side was there isn't any value to it.
>
> So I've got items that are 20 years old. I've got items that have been in place after the [Original L]ease that were purchased by the operator. They definitely were not included in the [1998 Sale Leaseback]. And I got a statement from the [Current O]wner saying there isn't any value to any of it. So I didn't put a lot of weight on what the personal or intangibles are.

R.R. at 259a. With respect to patient records, although Section 9.1.4 of the Original Lease provides that Missouri River "shall own and may remove . . . all patient records and other records in connection with the Facility," R.R. at 585a, the trial court expressed skepticism, stating:

> I got that language. But, you know, there's a footnote in my head to the extent those records might constitute medical records, what -- I got a feeling that some HIPPA[, (Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 18, 26, 29, and 42 U.S.C.)),] lawyer would be in the shorts of a REIT guy and try to walk off with those records in short order. I'm assuming that a fight broke out, but I'm just not sure that the tenant had any right to give to the landlord what the tenant didn't own.

R.R. at 295a. The trial court elaborated: "[T]he landlord says he gets them, but those records are the residents' records. And to the extent there are medical records, they can't be bought and sold so easily." R.R. at 296a.

[10] The parentheses in this column depict the depreciated value plus the additional value Glowacki attributed to the leased fee, which totals Glowacki's cost approach.

| | | | |
|---|---|---|---|
| 2010 | $10,025,000<br>($4,000,000+$6,025,000) | $10,025,000 | $10,025,000 |
| 2011 | $10,500,000<br>($4,600,000+$5,900,000) | $10,500,000 | $10,500,000 |
| 2012 | $11,050,000<br>($5,150,000+$5,900,000) | $11,050,000 | $11,050,000 |
| 2013 | $11,250,000<br>($5,650,000+$5,600,000) | $11,250,000 | $11,250,000 |
| 2014 | $12,200,000<br>($6,150,000+$6,050,000) | $12,200,000 | $12,200,000 |
| 2015 | $13,100,000<br>($6,350,000+$6,750,000) | $13,100,000 | $13,100,000 |
| 2016 | $13,200,000<br>($6,600,000+$6,600,000) | $13,200,000 | $13,200,000 |
| 2017 | $13,800,000<br>($6,650,000+$7,150,000) | $13,450,000 | $13,450,000 |
| 2018 | $14,150,000<br>($6,850,000+$7,300,000) | $13,800,000 | $13,800,000 |
| 2019 | (Not provided) | $14,150,000 | $14,150,000 |

*See* R.R. at 921a-925a, 941a.

On April 29, 2019, the Trial Court denied Taxpayers' appeal, adopting Glowacki's income approach because it was more credible and consistent with Pennsylvania *stare decisis*. Taxpayers appealed to this Court.[11]

---

[11] "This [C]ourt's review is limited to determining whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by the evidence." *Downingtown Area Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 131 A.3d 152, 156 n.4 (Pa. Cmwlth. 2015).

# I. Waiver

The District argues that, pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b)(4), Taxpayers waived all issues on appeal by filing an insufficiently detailed statement of errors complained of on appeal.

Initially, the Pennsylvania Superior Court has explained:

> [W]hen the trial court directs an appellant to file a concise statement of [errors] complained of on appeal, any issues that are not raised in such a statement will be waived for appellate review. Similarly, when issues are too vague for the trial court to identify and address, that is the functional equivalent of no concise statement at all. Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Thus, Rule 1925 is a crucial component of the appellate process. *Id.* 'When the trial court has to guess what issues an appellant is appealing, that is not enough for meaningful review.' [*Commonwealth v. Lemon*, . . . 804 A.2d 34, 37 (Pa. Super. 2002).]

*Commonwealth v. Smith*, 955 A.2d 391, 393 (Pa. Super. 2008) (citations omitted). "Importantly, however, '[e]ach error identified in the [Rule 1925(b) s]tatement will be deemed to include every subsidiary issue which was raised in the trial court.' Pa.R.A.P. 1925(b)(4)(v). . . ." *Desher v. Se. Pa. Transp. Auth.*, 212 A.3d 1179, 1185 (Pa. Cmwlth. 2019).

The District contends that Taxpayers' ambiguous statement of errors complained of on appeal hampered the trial court's ability to address the issues on appeal.[12] Regarding Taxpayers' first issue, the District stated: "Each expert

---

[12] Specifically, the District asserted in its brief:

> In their [statement of errors] complained of on appeal, [] Taxpayers identified two issues. First, Taxpayers claimed the trial court erred by finding the District's appraiser's testimony to be substantial evidence because the appraiser 'used an improper factor' when calculating the Property's [fair market value]. Taxpayers did not identify the alleged improper factor and provided no additional information regarding this

14

considered numerous factors in arriving at their value conclusions. To simply allege that the District's expert utilized '**an improper factor**,' without anything further, prevents the trial court from meaningfully addressing this issue." District's Br. at 16 (emphasis added). With respect to Taxpayers' second issue, the District asserts:

> The [Original Lease] and 2018 [L]lease[], with exhibits and amendments, are 56 pages and 106 pages, respectively. Taxpayers argue that, under these leases, the operators obtained 'more than just land and buildings.' ([Taxpayers' Br. at 7]). . . . The Taxpayers' statement of [errors] complained of on appeal does not dispute the trial court's conclusion that the economic value of any personal property is de minimis; it simply asserts that the trial court's value included personal property and intangibles. **Taxpayers do not identify the specific personal property included in the trial court's value conclusions.** This prevented the trial court from conducting any meaningful assessment of Taxpayers' claims.

District's Br. at 17 (emphasis added).

Taxpayers rejoin: "Throughout the trial of this matter, Taxpayers' central contention was that the leases encumbering the Property should not be used to value the real estate because the intangible components of the leases could not be extracted therefrom." Taxpayers' Reply Br. at 4.

---

> purported improper factor. Second, they argued the trial court erred by 'including value attributed to personal property and intangibles' in the Property's [fair market value]. Once again, Taxpayers did not identify the specifics of this alleged error and did not identify that personal property or intangible property allegedly included in the trial court's value conclusions.
>
> In its Rule 1925(a) Opinion, the trial court found that [] Taxpayers waived any issues on appeal by failing to specify the alleged improper factor or specific personal property and intangibles included in its value conclusions.

District's Br. at 15-16.

15

Before the trial court, Taxpayers argued that the Property's fair market value should not include consideration of the Leases because the Leases included elements that were not subject to real estate tax. Taxpayers offered expert testimony in support thereof. Thus, at trial, Taxpayers clearly identified the issues that were before the trial court, and generally referenced those very issues in their Rule 1925(b) statement. Consequently, "the language of Appellant's Rule 1925(b) statement is not vague; it is appropriately concise, given the mandate that the statement 'should not be redundant or provide lengthy explanations as to any error.' Pa.R.A.P. 1925(b)(4)(iv)." *Desher*, 212 A.3d at 1185. Accordingly, Taxpayers did not waive their issues on appeal.

## II. Fair Market Valuation

Taxpayers argue that the trial court erred by including intangible assets and other personal property in its fair market value determination.

The law is well established:

In a tax assessment appeal, the trial court proceeds *de novo.* Once the taxing authority's assessment is admitted into the record, it has made the *prima facie* case on the assessment. The burden then shifts to the appellant to present sufficient, competent, and credible evidence to overcome the taxing authority's *prima facie* case.

The [Consolidated County Assessment Law (]Assessment Law[)[13]] requires that real property be assessed at its 'actual value.' 53 Pa.C.S. § 8842. The actual value is a parcel's fair market value, which has been defined as 'the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied.' *Harley-Davidson Motor Co*[.] *v. Springettsbury T*[*wp.*], . . . 124 A.3d 270, 279 ([Pa.] 2015). The Assessment Law authorizes three approaches to

---

[13] 53 Pa.C.S. §§ 8801-8868.

a valuation: (i) the cost approach;[14] (ii) the comparable sales approach;[15] and (iii) the income approach,[16] which divides a subject property's annual net rental income by an investment rate of return. A trial court has discretion to decide which method of valuation is most appropriate for a given property.

When determining fair market value, the property tax assessment 'must include *all* relevant factors having a bearing on that value.' *Harley-Davidson*, 124 A.3d at 283. The assessment must include 'the *entire* property and not merely its constituent elements.' *Tech One* [*Assocs. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cty.*], 53 A.3d [685,] 700 [(Pa. 2012)]. The property must be valued based upon its current use even where an appraiser opines that the highest and best use of the property is different.

*Erie-W. Pa. Port Auth. v. Erie Cty. Bd. of Assessment Appeals*, 213 A.3d 1041, 1048-49 (Pa. Cmwlth. 2019) (citations omitted). Importantly, "non-real estate elements must be separately valued because they are not subject to real estate taxes[,]" and "they must be . . . backed out of the fair sale price to establish the fair market value for real estate tax purposes." *Grand Prix Harrisburg, LLC v. Dauphin Cty. Bd. of Assessment Appeals*, 51 A.3d 275, 277-78 (Pa. Cmwlth. 2012).

The actual or fair market value, while not easily ascertained, is fixed by the opinions of competent witnesses as to what the property is worth on the market at a fair sale. Many factors should be taken into account by the expert witness in arriving at his estimate of value.

---

[14] Section 8842(b)(1)(iii)(A) of the Assessment Law describes the cost approach as "reproduction or replacement, as applicable, less depreciation and all forms of obsolescence." 53 Pa.C.S. § 8842(b)(1)(iii)(A).

[15] "The comparable sales approach compares the subject property to similar properties with consideration given to size, age, physical condition, location, and other factors." *Aetna Life Ins. Co. v. Montgomery Cty. Bd. of Assessment Appeals*, 111 A.3d 267, 278 (Pa. Cmwlth. 2015).

[16] "The income approach or capitalization method is used to appraise income[-]producing real estate by dividing the annual net rental income (gross income minus expenses) expected from the property by the investment rate of return (the capitalization or 'cap' rate) for that property." *Cedarbrook Realty, Inc. v. Cheltenham Twp.*, 611 A.2d 335, 339 n.4 (Pa. Cmwlth. 1992).

*Buhl Found. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cty.*, 180 A.2d 900, 902 (Pa. 1962) (citation omitted).[17] However, "if an expert uses an improper factor when fixing the fair market value of real estate, his opinion is not substantial evidence that can support a finding of value." *Aetna Life Ins. Co. v. Montgomery Cty. Bd. of Assessment Appeals*, 111 A.3d 267, 279 (Pa. Cmwlth. 2015).

> The Pennsylvania Supreme Court has explained that there are
>
> two basic principles applicable to valuing real property which is subject to a long-term lease: First, **the 'economic reality' of the existence of the lease must be considered by an appraiser** in establishing the market value of property encumbered by a lease, since it will be a factor which affects the price which a purchaser of the property is willing to pay. Second, when the property generates income, **the capitalization of income approach is an appropriate method to use to ascertain its value**, and, **in applying that method, the contract rent received under the lease is the relevant income stream which is to be capitalized**, even if it is below prevailing market rental rates.

*Tech One Assocs.*, 53 A.3d at 703 (emphasis added). Thus, "when real estate is subject to a long-term lease, the portions of the property subject to a leasehold interest cannot be disregarded in valuing the property. Rather, the 'economic reality' of the lease must be considered in establishing the market value of the property." *In re Consol. Appeals of Chester-Upland Sch. Dist.*, 200 A.3d 1052, 1059 (Pa. Cmwlth. 2018) (citation omitted), *appeal granted*, *In re Chester-Upland Sch. Dist.*, 216 A.3d 1031 (Pa. 2019); *see also Downingtown Area Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 131 A.3d 152 (Pa. Cmwlth. 2015). "[O]nce [an] expert testifie[s] that he took the leases 'into consideration but did not make an adjustment, this failure to make an adjustment, if anything, goes to the weight of his testimony

---

[17] *Buhl* was superseded by statute as stated in *Grand Prix*.

18

and not its competency.'" *Aetna Life*, 111 A.3d at 280 (quoting *In re Appeal of Prop. of Cynwyd Invs.*, 679 A.2d 304, 309 (Pa. Cmwlth. 1996)).

"[I]t is well[]settled that all matters of credibility and evidentiary weight are within the exclusive province of the trial court and that these determinations are binding on this Court absent an error of law." *RAS Dev. Corp. v. Fayette Cty. Bd. of Assessment Appeals*, 704 A.2d 1130, 1137 (Pa. Cmwlth. 1997). "Nevertheless, as fact-finder, 'the trial court must state the basis and reasons for its decision.'" *Aetna Life*, 111 A.3d at 279 (quoting *Green v. Schuylkill Cty. Bd. of Assessment Appeals*, 772 A.2d 419, 433 (Pa. 2001)). "The function of the trial court in a tax assessment matter is not to independently value the property, but to weigh the conflicting testimony and values expressed by the experts and, based on the credibility of their opinions, arrive at a valuation." *Downingtown*, 131 A.3d at 157.

Further,

> although it is the role of the trial court to determine the credibility and weight of the evidence before it, our [S]upreme [C]ourt has noted that there is a difference between credibility as a matter of personal veracity and as a matter of substantive reasonableness.
>
>> The language chosen by the trial court . . . implies that its evaluation of the expert's testimony involved a credibility determination. In this regard, it is important to distinguish between credibility as a matter of personal veracity and as a matter of the substantive reasonableness of a witness's testimony. While the trial court's determinations concerning the former are unreviewable by an appellate court, the same is not true of the latter. *See McKnight* [*Shopping Ctr., Inc. v. Bd. of Prop*[.] *Assessment, Appeals and Review of Allegheny C*[*ty.*]], . . . 209 A.2d [389,] 392 [(Pa. 1965)] (rejecting the trial court's conclusion that expert testimony was not

19

credible, where such conclusion rested on an incorrect factual assumption). . . .

*Koppel Steel Corp. v. Bd. of Assessment Appeals of Beaver Cty.*, 849 A.2d 303, 305-06 (Pa. Cmwlth. 2004) (footnote omitted) (quoting *Green*, 772 A.2d at 434 n.11); *see also Masalehdan v. Allegheny Cty. Bd. of Prop. Assessment, Appeals & Review*, 931 A.2d 122 (Pa. Cmwlth. 2007). Accordingly, "[i]f the trial court rejects an expert's testimony for specified reasons, an appellate court may review the validity of those reasons." *Aetna Life*, 111 A.3d at 279.

Here, the trial court found both experts credible. However, the trial court rejected the substantive reasonableness of Shonberg's opinion on fair market value. Regarding the competing expert opinions, the trial court explained:

> Although [the trial court] found neither expert's approach to valuation perfect, in the end, [the trial court] found Glowacki's calculation of fair market value based on the income approach more credible. [The trial court] found Shon[]berg's explanation of the recent $15,768,000 sale as attributable in large part to the non-real estate aspects of the [P]roperty, hard to swallow, particularly since the deed (and transfer taxes paid thereon) does not except out any amount for intangibles.
>
> In accordance with *Tech One Associates* . . ., in order to determine the market value of property, the leased fee and the leasehold must be considered. [The trial court] decline[s] Shonberg's analysis under the cost approach because he did not consider the value of the leased fee and leasehold interests.
>
> Furthermore, as suggested by the court in *Downingtown . . .* , [**the trial court**] **believe**[s] **that the income approach is the best method of calculating the actual value** of this type of income producing property. As previously noted, employment of this method should include a consideration of both the landlord's leased fee and the tenant's leasehold interest. . . . **To examine a property in its unencumbered form is to ignore the economic realities of commercial real estate transactions**. Similarly, [**the trial court**] **cannot simply ignore the fact that the current lease nets**

20

**the owner of the subject property approximately 1 million dollars per year in rental income**. To the extent that [Taxpayers] argue[] that there are elements in the leases that are extraneous to the real estate, [the trial court] find[s] the economic value of those intangibles de minim[i]s. Although teasing out the real estate and intangible aspects of the business is murky science at best, [**the trial court**] **cannot simply don blinders, as Shonberg advocates, and ignore the fact that the lease enhances the fair market value of the [P]roperty**.

R.R. at 5a-6a (emphasis added; citations and footnotes omitted).

The trial court exercised its discretion to determine the appropriate valuation method for the Property. Here, Missouri River and Current Owner, two real estate investment trusts holding the Property as an income-producing investment, have been the only Property owners since 1998. *See* R.R. at 252a. This Court has explained that "[t]**he income approach is the most appropriate method for appraising a property typically purchased as an investment** . . . , because such a property is valued by a purchaser for its ability to produce income." *In re Appeal of V.V.P. P'ship*, 647 A.2d 990, 992-93 (Pa. Cmwlth. 1994) (emphasis added); *see also 1198 Butler St. Assocs. v. Bd. of Assessment Appeals, Cty. of Northampton*, 946 A.2d 1131 (Pa. Cmwlth. 2008).

Relative to the personal property and intangibles, Shonberg conceded that the FF&E's value is de minimis, and acknowledged that the Facility's staff was also of limited monetary value. Shonberg and Taxpayers did not provide a justification or a legal basis for considering the residents as intangible property. As the trial court noted, "[n]obody owns the residents. They're free to come and go as they want." R.R. at 288a. Finally, Taxpayers did not address the trial court's concerns regarding ownership of resident medical records. Given these considerations, substantial evidence supported the trial court's finding that the value of the FF&E and intangibles was de minimis. Accordingly, the trial court did not err

when it gave greater weight[18] to and credited Glowacki's income approach which reflected the Property's income-producing nature.

For all of the above reasons, the trial court's order is affirmed.[19]

_____
ANNE E. COVEY, Judge

---

[18] Although Shonberg testified that he considered the leases and, thus, his testimony was competent, his failure to make adjustments for the leases goes to the weight of his testimony, and "the trial court has exclusive province over all matters of credibility and evidentiary weight." *Aetna Life*, 111 A.3d at 279.

[19] Relying solely on Section 8854(a)(6) of the Assessment Law, 53 Pa.C.S. § 8854(a)(6), Taxpayers also assert in their Reply Brief that the Board's brief to this Court, which incorporates by reference the District's brief, violates the Board's statutory duty to defend **its** assessment. That Section pertains to appeals to the courts of common pleas and provides that a tax board:

> shall have the **power and duty** to present a prima facie case in support of its assessment, to cross-examine witnesses, to discredit or impeach any evidence presented by the taxable person, **to prosecute or defend an appeal in any appellate court and to take any other necessary steps to defend its valuation and assessment.**

53 Pa.C.S. § 8854(a)(6) (emphasis added).

Notably, Section 8854(b) of the Assessment Law, addresses appeals to this Court, and simply provides: "The [B]oard, or any party to the appeal to the court of common pleas, may appeal from the judgment, order or decree of the court of common pleas." 53 Pa.C.S. § 8854(b). At the trial court's hearing, the Board offered Maas' testimony to support its assessed value for the Property. The trial court ultimately adopted Glowacki's higher assessed value as the Property's fair market value. Presumably, the Board agreed with the trial court's decision and, therefore, incorporated by reference the District's argument in requesting this Court affirm the trial court's order. This Court discerns the Board did not err by doing so.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Missouri River Corp. | : |
| | : |
| v. | : |
| | : |
| Erie County Board of Assessment | : |
| Appeals, Erie County, PA | : |
| | : |
| Interested Parties: | : |
| City of Erie School District, City of | : |
| Erie and Erie County | : |
| | : |
| Parcel No.: 17-040-037.0-210.00 | : |
| Property Address: 1012 W. Bayfront | : |
| Pkwy., City of Erie, Erie County | : |
| | : |
| Appeal of: Missouri River Corp. | : |
| (Sunrise Senior Living, Inc., tenant and | : |
| agent) and NHI-REIT of Bickford, | : |
| (Bickford Master Buckeye, LLC, | : |
| tenant and agent), successor-in-interest | : |
| to Missouri River Corporation | :   No. 639 C.D. 2019 |
| | |
| Missouri River Corp. | : |
| | : |
| v. | : |
| | : |
| Erie County Board of Assessment | : |
| Appeals, Erie County, PA | : |
| | : |
| City of Erie School District, City of | : |
| Erie and Erie County | : |
| | : |
| Parcel No.: 17-040-037.0-210.00 | : |
| | |
| Appeal of: Missouri River Corporation | :   No. 640 C.D. 2019 |
| and NHI-REIT of Bickford | : |

## O R D E R

AND NOW, this 2nd day of March, 2020, the Erie County Common Pleas Court's April 29, 2019 order is affirmed.

_____
ANNE E. COVEY, Judge